UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
UNITED STATES OF AMERICA,

                                     S1 07 Cr. 403 (PKC)

           -against-

                                   FINDINGS OF FACT AND
                                   CONCLUSIONS OF LAW
                                   PURSUANT TO RULE 23(c),
                                   <u>FED R. CRIM. P.</u>

MAURICIO ALFONSO MAZZA-ALALUF,

                            Defendant.

-------------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

        On October 15, 2008, the government filed a two-count superseding indictment against defendant Mauricio Mazza-Alaluf.  The first count charged him under 18 U.S.C. § 371 with conspiring to conduct an unlicensed money-transmitting business in violation of 18 U.S.C. § 1960, and the second count charged him with a substantive violation of section 1960.  Mazza entered a plea of not guilty.

        Defendant Mazza applied to the Court to waive his Sixth Amendment right to a trial by jury.  Rule 23(a), Fed. R. Crim. P.  As required by Rule 23(a)(1), Mazza submitted a signed waiver affirming his decision.  The government consented to the waiver.  Rule 23(a)(2), Fed. R. Crim. P.  On November 6, 2008, I questioned Mazza and concluded that his waiver was knowing and voluntary, and approved it.  Rule 23(a)(3), Fed. R. Crim. P.

        This case was tried to the Court on November 13 and 14, 2008.  The government presented the testimony of six witnesses and the defendant testified in his

own defense.  Both sides rested, and in lieu of closing arguments, submitted memoranda

of law to the Court.

These are my findings of fact and conclusions of law.  For the reasons set

forth, I find that the government has proved beyond a reasonable doubt Mazza's guilt on

the crimes charged in counts one and two of the superseding indictment.


BACKGROUND

Mazza is a Chilean national with a college degree in business

administration.[1]  (Tr. at 237-38.)  Sometime in 1988 or 1989, he acquired the business

that became Turismo Costa Brava S.A. ("Turismo").  (Tr. at 240.)  The services that

Turismo provided were varied, and included the transfer of funds to third parties on

behalf of customers.  (Tr. at 243.)  Mazza described the company's functions as "an

auxiliary to the banking system."  (Tr. at 243.)  A Chilean business purchasing goods from

abroad might retain Turismo to relay payments to the non-Chilean seller (Tr. at 125-26)

or a Chilean business might arrange for Turismo to facilitate its own payments from a

U.S. customer.  (Tr. at 255, 243.)  Some customers with U.S. dollars wanted their funds

transferred to U.S. accounts, Mazza testified.  (Tr. at 243.)  Turismo also acted as a local

currency exchange for individuals (including tourists) and for currency-exchange houses

located in Chile and neighboring countries (often known as casas de cambio).  (Tr. at

214, 242, 244-45.)  It sometimes converted euros into dollars and directly transmitted

U.S. dollars to accounts designated by its customers.  (Tr. at 211-13.)  At the time of

Mazza's arrest, Turismo operated three storefront businesses in Santiago, Chile.  (Tr. at

---

[1] All references to "Mazza" are to the defendant Mauricio Mazza-Alaluf.  All other persons with the last name Mazza are referred to by first and last name.

241.)  Turismo had no branch offices or employees in the United States, and it solicited

no customers in the United States.  (Tr. at 249, 258.)

Turismo opened and maintained bank accounts in the United States,

specifically including accounts with the New York-based Israel Discount Bank, the

Harris Trust and Savings Bank in Chicago, Illinois ('Harris'), and a Chase Manhattan Bank

('Chase') branch located in Dearborn, Michigan.[2]  (Tr. at 246.)  Mazza testified that

Turismo used U.S. accounts because Turismo often transacted business using the U.S.

dollar, which was a standard currency used in Latin America.  (Tr. at 268-69.)  Turismo

also retained Beacon Hill Service Corporation ('Beacon Hill') to act as its 'international

business agent.'  (Gov't Ex. 31.)  Beacon Hill operated out of New York, where it opened a

Chase account under its own name as an agent for Turismo.  (Gov't Ex. 11.)  Many

(although not all) of the transactions facilitated by Beacon Hill on Turismo's behalf

originated from U.S. banks and were cleared through U.S. banks.  (Gov't Exs. 15, 16.)

Mazza described Beacon Hill's significance to Turismo as follows:

> Essentially, it was as if it were a checking account.  It allowed me to
> deposit checks.  It allowed me to collect checks.  It allowed me to issue
> checks.  And the most important thing for the development of my business
> as of that moment was to make wire transfers from my office in Chile.

(Tr. at 248.)  Turismo used these U.S. banks accounts to facilitate thousands of

transactions totaling hundreds of millions of dollars.

The existence of these U.S.-based accounts and Turismo's activities

regarding them are at the heart of this case.  Turismo used a multi-step process to place

funds into U.S. accounts.  Its employees and owners traveled to Los Angeles

International Airport ('LAX') carrying bulk cash, often denominated in euros and other

---

[2] The Chase account also is periodically referred to by trial witnesses as the J.P. Morgan account.

European currencies.  (Gov't Ex. 43; Tr. at 146.)  Turismo couriers openly declared the

currency as they passed through customs.  (Tr. at 119-20, 146.)  Once in the U.S., the

Turismo representatives delivered the currency to an armored car service, which then

transported the currency to the Associated Foreign Exchange ('AFEX').  (Tr. at 121-22.)

AFEX transmitted the funds in their dollar equivalent to Turismo's U.S. bank accounts.

(Tr. at 122, 147.)

       Turismo, and Mazza personally, came to the attention of U.S. authorities

during one such trip in 2006.  On May 5 of that year, Mazza passed through U.S. customs

at LAX carrying approximately $1.8 million in euro and other foreign currencies.  (Tr. at

118-20.)  Two agents of the Drug Enforcement Administration and one agent of the

Internal Revenue Service questioned Mazza about the cash he was carrying, and Mazza

informed them that it came from Chile.  (Tr. at 119-20.)  Mazza described himself to

authorities as manager and part owner of Turismo.  (Tr. at 121.)  At the conclusion of the

interview, Mazza was released.

       On March 31, 2007, Mazza was arrested while again passing through

LAX.  (Tr. at 123.)  At the time of arrest, he carried approximately $2 million worth of

euros and other forms of currency, denominated mostly in large euro notes.  (Tr. at 124.)

He stated to law enforcement officials that much of the money came from <u>casas de</u>

<u>cambio</u>, and described to the officials aspects of Turismo's business.  (Tr. at 124-28.)

       Although Mazza and the government largely agree on these facts, they

differ significantly on whether they establish that Turismo operated as a money-

transmitting business subject to statutory registration requirements.  Mazza contends that

18 U.S.C. § 1960 does not apply.  In his view, Turismo, as a business operating in Chile,

was not subject to the registration requirements of a money-transmitting business, and Turismo's use of U.S. bank accounts was insufficient to bring Mazza within section 1960's boundaries.  The government, by contrast, argues that Turismo was an unlicensed money-transmitting business of precisely the type that section 1960 was intended to reach.

OVERVIEW OF SECTION 1960

Conducting, controlling, managing, supervising, directing or owning an unlicensed money-transmitting business is a crime under 18 U.S.C. § 1960 which was enacted as an anti-money laundering measure.  Section 1960 was amended in 2001 as part of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("Patriot Act"), Pub. L. No. 107-56, 115 Stat. 272 (2001).  Broadly summarized, section 1960 makes it a felony to own or manage a money-transmitting business without obtaining the licenses required pursuant either to state law or to requirements set forth by federal statute or regulation.  Section 1960 reads in relevant part:

> (a)  Whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both.
>
> (b)  As used in this section—
>
>    (1)  the term "unlicensed money transmitting business" means a money transmitting business which affects interstate or foreign commerce in any manner or degree and–
>
>      (A)  is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the

operation was required to be licensed or that the
operation was so punishable;

(B)  fails to comply with the money transmitting
business registration requirements under section 5330
of title 31, United States Code, or regulations
prescribed under such section; or

(C)  otherwise involves the transportation or
transmission of funds that are known to the defendant
to have been derived from a criminal offense or are
intended to be used to promote or support unlawful
activity;

(2)  the term "money transmitting" includes transferring
funds on behalf of the public by any and all means
including but not limited to transfers within this country or
to locations abroad by wire, check, draft, facsimile, or
courier[.]

18 U.S.C. § 1960.

Judge Kaplan has aptly described section 1960 as containing "somewhat

peculiar terms." United States v. Bah, 2007 WL 1032260, at *1 (S.D.N.Y. Mar. 30, 2007).

Section 1960 does not itself set forth the criteria to determine whether a money-

transmitting business is required to register.  Instead, it incorporates the registration

obligations enacted by individual states, 18 U.S.C. § 1960(b)(1)(A), as well as a federal

statute requiring a money-transmitting business to register with the Treasury Department,

18 U.S.C. § 1960(b)(1)(B).  "That the statute essentially defines the term 'money

transmitting business' as 'money transmitting business' in subsection (b)(1) is among the

more glaring problems the statute presents." United States v. Ali, 2008 WL 4773422, at

*12 (E.D.N.Y. Oct. 27, 2008).  Section 1960's Patriot Act revisions also removed a mens

rea requirement that the defendant must be aware of the obligation to register a money-

transmitting business.  See United States v. Elfgeeh, 515 F.3d 100, 134 (2d Cir. 2008)

(finding no error in instructions to the jury that a defendant need not have knowledge of licensing requirements in order to be found guilty); Bah, 2007 WL 1032260, at *1 ("Section 1960, as amended by the USA PATRIOT Act, makes the defendant's state of mind with respect to the need for a State license irrelevant, at least in the absence of a relevant provision of State law making the need for a license under State criminal law depend upon the defendant's state of mind.")

To find Mazza guilty under section 1960, I must find beyond a reasonable doubt that 1.) Mazza knowingly conducted, controlled, managed, supervised, directed or owned 2.) a money-transmitting business that 3.) affected interstate or foreign commerce, and 4.) was not in compliance with applicable licensing requirements under either state or federal law.  18 U.S.C. § 1960(a).

I.      Mazza Knowingly Conducted, Controlled, Managed, Supervised,
        Directed or Owned Turismo.

The evidence convincingly demonstrates that Mazza partially owned Turismo, was in control of its activities, and was actively involved in its day-to-day affairs.  (See, e.g., Tr. at 243 (testimony of Mazza describing Turismo as "the institution that I operated . . . "); 257-58 (testifying that he was one of Turismo's three owners).) Based on Mazza's own testimony, I find beyond a reasonable doubt that Mazza conducted, controlled, managed, supervised, directed and owned Turismo.

II.     Turismo Was a Money-Transmitting Business.

As defined by section 1960, Turismo was a money-transmitting business. The phrase "money transmitting" is defined at 18 U.S.C. § 1960(b)(2) as including

'transferring funds on behalf of the public by any and all means including but not limited

to transfers within this country or to locations abroad by wire, check, draft, facsimile, or

courier." The statute does not define the word 'business," which should be afforded its

ordinary meaning as an enterprise that operates for profit.  See Travelers Insurance Co. v.

Carpenter, 411 F.3d 323, 334 (2d Cir. 2005) (utilizing Black's Law Dictionary to define a

term undefined by statute); Black's Law Dictionary (8th ed. 2004) (defining business as

'[a] commercial enterprise carried on for profit.").  The Second Circuit has noted that under

section 1960, '[a] money transmitting business receives money from a customer and then,

for a fee paid by the customer, transmits that money to a recipient in a place that the

customer designates, usually a foreign country." United States v. Velastegui, 199 F.3d

590, 592 (2d Cir. 1999), cert. denied, 531 U.S. 823 (2000).  I find beyond a reasonable

doubt that Turismo was a business that transferred funds on behalf of the public within

the United States or to locations abroad (Tr. at 246-47, 265 (testimony of Mazza

acknowledging Turismo's use of U.S. bank accounts to facilitate client transfers)) and is a

money-transmitting business within the meaning set forth at section 1960.

### III.    Turismo Affected Interstate and Foreign Commerce.

Mazza's own testimony established that Turismo engaged in interstate and

foreign commerce.  Mazza testified that he helped facilitate payments from the United

States to Turismo clients in Chile (Tr. at 254-56), and that payments originating from the

United States and sent to Turismo occurred 'many" times.  (Tr. at 253.)  Turismo also

facilitated the transfer of funds between bank accounts located in the United States.  (Tr.

at 265.)  I find beyond a reasonable doubt that Turismo's activities affected interstate and

foreign commerce.  See United States v. Sabbeth, 262 F.3d 207, 218-19 (2d Cir. 2001)

(effect on interstate commerce need only be <u>de minimis</u> to premise guilt in money laundering prosecution).

IV.   Turismo Was Required to Register Under Certain State Statutes, <u>but Failed to Do So.</u>

I now turn to the statutory requirements governing the licensing and registration of money-transmitting businesses, and whether Turismo's activities were of a nature that required it to register with the relevant state and federal authorities.  First, I consider whether Turismo failed to comply with state licensing laws incorporated at 18 U.S.C. § 1960(b)(1)(A), specifically the laws of Illinois, Michigan and New York.  I then consider whether the federal licensing regime incorporated at 18 U.S.C. § 1960(b)(1)(B) applied to Turismo.  Mazza contends that Turismo was a Chilean business, and that its use of U.S.-based bank accounts does not fall within any of these registration regimes.

A.   Turismo Unlawfully Acted as an Unlicensed Money-<u>Transmitting Business in the State of Illinois.</u>

Illinois law requires a license for a money-transmitting business operating in the state.  The relevant portion of the Illinois Transmitters of Money Act reads as follows:

> License required.  No person may engage in this State in the business of selling or issuing payment instruments, transmitting money, or exchanging, for compensation, payment instruments or money of the United States government or a foreign government to or from money of another government without first obtaining a license under this Act. Separate licenses shall not be required, however, for persons acting as authorized sellers of licensees under this act.

205 I.L.C.S. 657/10.  A "money transmitter" is defined as "a person who is located in <u>or doing business in</u> [Illinois] and who directly or through authorized sellers does any of the

following in [Illinois]: . . . (2) Engages in the business of receiving money for transmission or transmitting money." 205 I.L.C.S. 657/5 (emphasis added).  On its face, the Illinois statute makes plain that a person "doing business in" Illinois is subject to the statute's registration requirement, and distinguishes a person "doing business in" Illinois from a person "located in" the state.

In September 2003, Turismo opened an account with Harris in Chicago, Illinois, into which AFEX then wired what was described at trial as a substantial percentage of $200 million to $240 million transferred by Turismo.  (Gov't Ex. 36; Tr. 94, 147.)  Turismo used an online account with Harris to transmit funds via wire transfers.  (Gov't Exs. 38, 38-A, 39; Tr. at 98-99.)  During 2005 alone, Turismo wired more than $106 million through the Harris account.  (Gov't Ex. 39.)

Turismo also maintained a lock box at Harris Bank, and received tens of millions of dollars via wire transfers and checks sent to its Harris lock box.  (Gov't Ex. 37-A to 37-LL.)  As described at trial by Manuel Ruiz, an assistant vice president in the cash management sales department at Harris, "[a] lock box is a method where we actually have the ability to collect receivables sooner than later for the client," and is "a P.O. box that the bank sets up through the post office acting as agent for the company."  (Tr. at 96.)  Ruiz testified that a lock box allows the customer to receive and clear checks for rapid deposit into customers' accounts.  (Tr. at 96-97, 116.)  The lock box Turismo used through Harris was physically located in Chicago, and hundreds of checks drawn on U.S. banks by U.S. account holders were relayed through the Harris lock box.  (Gov't Ex. 40.)  As Ruiz stated, checks can be sent to the lock box by "[a]nybody that has that lock box number who it's provided to."  (Tr. at 97.)  Harris opened mail sent to the lock box, cleared

the received checks through the Federal Reserve, and deposited the checks' proceeds into the Harris account.  (Tr. at 96-97.)  The lock box received no general business mail for Turismo, and Harris provided no other services through the lock box.  (Tr. at 116.) Harris closed Turismo's account on or about December 6, 2006.  (Tr. at 111.)

I find beyond a reasonable doubt that Turismo engaged in the business of transmitting money in the State of Illinois, and was required to obtain a license under the Illinois Transmitters of Money Act, 205 I.L.C.S. 657/10.  No such license ever issued. The government has proven beyond a reasonable doubt that Mazza owned, managed, supervised, conducted, directed and controlled an unlicensed money-transmitting business under 18 U.S.C. § 1960(b)(1)(A).

### B.  Turismo Unlawfully Acted as an Unlicensed Money-Transmitting Business in the State of Michigan.

The Michigan Money Transmission Services Act provides:

> Except as otherwise provided in this section and subject to section 4, a person shall not provide money transmission services in this state after December 31, 2006 without a license under this act or a class I license issued under the consumer financial services act, 1988 PA 161, MCL 487.2051 to 487.2072.

M.C.L.A. 487.1011(1).  Michigan law defines "money transmissions services" to mean, in part, "receiving money or monetary value for transmission." M.C.L.A. 487.1003(c).   In a separate provision of the Money Transmission Services Act, Michigan makes it a felony for a person to knowingly engage in an activity for which a license is required without obtaining the necessary license.  M.C.L.A. 487.1042(3).

The Money Transmission Services Act was enacted with a goal of "completing the regulatory circle envisioned with the passage of the USA Patriot Act."

Michigan House Fiscal Agency Bill Analysis, H.B. 5328, at 2 (Mar. 16, 2006).

"According to state regulators, the USA Patriot Act provides that violation of a state

money transmitter law is also violation of the federal act and would subject the person to

additional prosecution in federal court.  A new state law would help combat money

laundering." Id.  In other words, one purpose of the Michigan statute was enhanced

enforcement of section 1960.

On or about November 8, 2006, Turismo opened its account with the

Chase branch in Dearborn, Michigan.  (Gov't Ex. 13.)  The account was opened in the

name of Turismo Costa Brava SA, with its business address listed as 1100 N. Telegraph,

Dearborn MI, 48128.  (Gov't Ex. 13.)  Chase account papers stated that Turismo is "a

corporation duly organized and in good standing under the laws of the state/country of

MI . . . ." (Gov't Ex. 13.)[3]  Depository and withdrawal authorization was granted to Luis

Mazza as Turismo president,[4] and to defendant Mauricio Mazza, who was identified as

Vice President.  (Gov't Ex. 13.)  On the "Business Signature Card" attached to Turismo's

Chase application, Luis Mazza is listed with a taxpayer identification number, and

defendant Mazza also is named on the application.  (Gov't Ex. 13.)  A second taxpayer

identification number appears on the account papers, which I conclude was in reference

to Turismo.  (Gov't Ex. 13.)

In opening the account, Turismo was aided by an individual named Karl

---

[3] No additional evidence as to Turismo's purported incorporation in the State of Michigan was presented at trial.  There is no basis from which to conclude that Turismo had, in fact, incorporated under the laws of Michigan or that the representation in the account documents was made by either Mazza or a co-conspirator.

[4] Luis Mazza is the defendant's cousin and business partner, and first became associated with Turismo in approximately 2001 or 2002.  (Tr. at 248-49.)

Fava, who forwarded to Turismo mail related to the Chase account.  (DX B.)[5]  Mazza

testified that Fava was known to Luis Mazza, and was an accountant who worked out of

the 1100 Telegraph Road address.  (Tr. at 251; DX B.)  Chase mailed Turismo's monthly

account statements to that Telegraph Road address.  (Gov't Ex. 14A-14F.)  Mazza

testified that Fava enabled Turismo to satisfy Chase's requirements for opening a

checking account:  Fava provided a mailing address in Michigan, and obtained "an

employee number."  (Tr. at 252.)

From January 1, 2007 (when the Michigan statute became effective)

through March 31, 2007, the Chase account took in approximately $42 million, and

transmitted approximately the same amount to other recipients.  (Gov't Ex. 66.)  Some of

the account's incoming funds came via AFEX, while many others came through direct

wire transfers from non-Turismo accounts and book transfers from Turismo's other Chase

accounts.  (Gov't Ex. 17; Tr. at 65.)  Turismo transferred funds through the Michigan

account on behalf of its clients, including to many accounts elsewhere in the United

States.  (Gov't Ex. 18.)

In the aggregate, Turismo's activities in Michigan were substantial.  It

opened a bank account in the state using an address located in the state; received

logistical support from an individual in the state; and moved approximately $42 million

through an account in the state.  In light of the foregoing, I find beyond a reasonable

doubt that Turismo engaged in money transmission services as it is defined under

Michigan law, and that it failed to comply with the state's licensing obligations in

violation of section 1960(b)(1)(A).  Mazza owned, managed, supervised, conducted,

---

[5] The government and Mazza stipulated to certain facts regarded Fava's activities on behalf of Turismo.
That stipulation was admitted into evidence as Defendant's Exhibit B.

directed and controlled Turismo, a money-transmitting business that failed under

M.C.L.A. 487.1011(1) to obtain a license for a money-transmitting business.


### C. Turismo Unlawfully Acted as an Unlicensed Money-Transmitting Business in the State of New York.

New York law forbids "engag[ing]" in a money-transmitting business

without a license from the New York superintendent of banks.  It provides in relevant

part:

> No person shall engage in the business of selling or issuing checks, or
> engage in the business of receiving money for transmission or transmitting
> the same, without a license therefor obtained from the superintendent as
> provided in this article . . . .

N.Y. Banking Law § 641(1) (McKinney 2008).  New York imposes criminal penalties that

vary based on the amount of money transmitted and the duration of the business's activity.

N.Y. Banking Law § 650(2)(b).  The New York statute has been described as setting forth

a strict liability crime.  See Bah, 2007 WL 1032260, at *3.

Turismo opened two accounts with the Israel Discount Bank ("IDB") in

New York, NY.  One account opened in July 1999 and closed in or about December

2003, (Gov't Ex. 23, 24-OO; Tr. at 26-27) and the second account opened in May 2000

and closed in December 2005.  (Gov't Ex. 25, 26-LLL, Tr. at 26-27.)  The two accounts

received and transmitted tens of millions of dollars.  (Gov't Ex. 24A to 24-OO, 26-A to

26-LLL, 51, 53, 55.)  Over $17 million worth of checks were drawn from Turismo's

accounts with IDB, with many of Turismo's IDB checks deposited into non-Turismo

accounts in New York.  (Gov't Ex. 56.)

In addition to the two IDB accounts, Beacon Hill (which, as noted above,

was based in New York and acted as Turismo's "international business agent") opened a Chase account in New York in the name of "Costa Brava Turismo." (Gov't Ex. 11.) Beacon Hill facilitated the receipt of approximately 500 wire transfers and sent over 1,000 wire transfers.  (Gov't Ex. 12A-R, 15, 16.)  Many of the incoming transfers originated from and cleared through U.S. banks.  (Gov't Ex. 15.)

        I find beyond a reasonable doubt that Turismo engaged in the business of receiving and transmitting money as defined under New York Banking Law, and was obligated to register under New York Banking Law § 641.  It did not do so.  Mazza owned, managed, supervised, conducted, directed and controlled a money-transmitting business that was required to be licensed under New York law, but was not.

> D.  The Government Has Not Proven that Mazza, as Owner and Manager of Turismo, Operated an Unlicensed Money-Transmitting Business in Violation of 18 U.S.C. § 1960 and 31 U.S.C. § 5330.

        Section 1960 makes it a crime to "fail[] to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section[.]"  18 U.S.C. § 1960(b)(1)(B).  It does not set forth the criteria to determine whether a money-transmitting business is required to register with the Department of Treasury.

        Section 5330 was enacted as part of the Bank Secrecy Act (which includes the Currency and Foreign Transactions Reporting Act) and was intended to provide an investigative tool for criminal, tax and regulatory matters.  See 31 U.S.C. § 5311 (setting forth subchapter's purpose); California Bankers Ass'n v. Schultz, 416 U.S. 21, 26-30 (1974) (summarizing Congressional intent behind the Bank Secrecy Act); 31 C.F.R. §

103.12 ("The Secretary hereby determines that the reports required by this subpart have a high degree of usefulness in criminal, tax, or regulatory investigations and proceedings."). Among other things, "Congress was concerned about a serious and widespread use of foreign financial institutions, located in jurisdictions with strict laws of secrecy as to bank activity, for the purpose of violating or evading domestic criminal, tax, and regulatory enactments." California Bankers Ass'n, 416 U.S. at 27. The Supreme Court has described the Act as delegating to Treasury regulators "an impressive sweep" of authority that "might well surprise or even shock those who lived in an earlier era." Id. at 30.

Section 5330 states in relevant part that "[a]ny person who owns or controls a money transmitting business shall register the business (whether or not the business is licensed as a money transmitting business institution in any State) with the Secretary of Treasury[.]" 31 U.S.C. § 5330(a)(1). It further provides that a "money transmitting business" is one that:

> (A) provides check cashing, currency exchange, or money transmitting or remittance services, or issues or redeems money orders, travelers' checks, and other similar instruments or any other person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system;;[6]
>
> (B) is required to file reports under section 5313; and
>
> (C) is not a depository institution (as defined in section 5313(g)).

31 U.S.C. § 5330(d)(1) (emphasis added).[7] Section 5330(d)(1)(A) sets forth a definition of "money-transmitting business" that varies from the definition of "money transmitting

_____

[6] The double semi-colons appear in the original statutory text, presumably in error.
[7] 31 U.S.C. § 5330(d)(1)(C) is not at issue in this case.

business" at 18 U.S.C. § 1960(b)(2), but that, for the purposes of this case, contains no conflicting terms.

It is critical, however, that section 5330(d)(1)(B) uses the conjunctive word "and." All three subparagraphs of section 5330(d)(1) must be satisfied in order to fall within the registration requirements of a "money transmitting business," including the obligation to file reports under section 5313. 31 U.S.C § 5330(d)(1)(B). Thus, in order to be a money-transmitting business under section 5330, an entity must be required to file reports mandated under section 5313. I reject the government's contention that Turismo's registration obligations can be determined without reliance on section 5313 and the regulations issued thereunder.

Section 5313(a) provides that:

> When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coins or currency (or other monetary instruments the Secretary of the Treasury prescribes), in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant in the transaction the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes.

31 U.S.C. § 5313(a) (emphasis added). The text therefore delegates to the Secretary of Treasury the rulemaking power to require a report from "a domestic financial institution" for a transaction "in an amount, denomination" or "amount and denomination" or "under circumstances the Secretary prescribes by regulation." 31 U.S.C. § 5313(a). Section 5313(a) relies on Treasury regulations to set the amount, denomination and circumstances that require registration. It does not require a report for literally every transaction of any amount.

In 2001, Congress directed that section 5313 should be enforced in a manner that limits the number of reports filed with Treasury because "the volume of currency transaction reports is once again interfering with effective law enforcement," Efficient Use of Currency Transaction Report System, Pub. L. 107-56, § 366, 115 Stat. 335 (2001), at (a)(3), and directed Treasury to report on whether broader registration exemptions were desirable.  Congress further stated that "that some financial institutions are not utilizing the exemption system," and that there should be renewed emphasis placed by Treasury on limiting the number of reports filed under section 5313, since many reports "have little or no value for law enforcement purposes . . . ." Id. at (a)(3), (b)(1)(B).

The text of section 5313(a) raises two additional questions:  (1) whether Chile-based Turismo falls within the statute's oversight of "domestic financial institution[s]," and (2) whether Turismo's activity falls within a category required by law to be reported to Treasury under section 5313 and the regulations promulgated thereunder.

i. Turismo Falls Within the Statutory Definition of a Domestic Financial Institution.

First, I consider whether Turismo is a "domestic financial institution" under section 5313(a).  The issue is resolved in by the Bank Secrecy Act's definitional section. As set forth at 31 U.S.C. § 5312(b)(1), "[i]n this subchapter, 'domestic financial agency' and 'domestic financial institution' apply to an action in the United States of a financial agency or institution." (emphasis added)  The statute specifies certain categories of business as being a "financial institution," including "a licensed sender of money or any other person who engages as a business in the transmission of funds, including . . . any network of people who engage as a business in the transfer of money domestically or internationally

outside the conventional financial institutions system[.]" 31 U.S.C.§5312(a)(2)(R) (emphasis added).  As a business engaged in the transmission of funds in the United States, Turismo qualifies under 31 U.S.C.§5313(a) as a "domestic financial institution." Accord United States v. Eisenstein, 731 F.2d 1540, 1543 (11th Cir. 1984).

       ii.      Section 5313 Required Turismo to Register With the United States Treasury Department.

Second, for Mazza to be found guilty under section 1960, Turismo must have engaged in activities that triggered a reporting obligation under sections 5330 and 5313.

The government incorrectly asserts that section 5313 is relevant solely to the procedures of registration, and quotes selectively from the text of subsection 5313(a). (Gov't Post-Trial Mem. at 28-29.)  As noted above, the text of section 5313 expressly delegates an array of powers to the Secretary of Treasury, and this authority has been exercised extensively.  See C.F.R. Title 31, Subpart B, Ch. I, Pt. 10.[8]  Multiple Treasury Department regulations specify which activities trigger a registration obligation. Congress's broad delegation of rulemaking authority under the statute has been noted repeatedly.  See Ratzlaf v. United States, 510 U.S. 135, 139 n.3 (1994) (section 5313(a) empowers the Treasury Secretary to impose report-filing requirements on a variety of parties to a transaction); California Bankers Ass'n, 416 U.S. at 30; Elfgeeh, 515 F.3d at 108 (citing 31 C.F.R.§103.22(b)(1), a regulation requiring a report of transactions totaling more than $10,000 from financial institutions other than casinos, as the key substantive registration requirement for the section 1960 prosecution in that case).  See also United

_____

[8] Regulations as to filing procedure are, for example, set forth as parts of 31 C.F.R. §§ 103.22 and 103.27.

States v. Tannenbaum, 934 F.2d 8, 11-12 (2d Cir. 1991) (applying 31 C.F.R. § 103.22(a), a

regulation promulgated under section 5313, as substantive criteria for determining

criminal violation of the Bank Secrecy Act); United States v. Murphy, 809 F.2d 1427,

1430 (9th Cir. 1987) ("The reporting act is not self-executing; it can impose no reporting

duties until implementing regulations have been promulgated.  An individual cannot be

prosecuted for violating the Act unless he violates an implementing regulation.") (citing

California Bankers Ass'n, 416 U.S. at 267).

          The government also asserts that the regulations promulgated under

section 5313 and published in the Code of Federal Regulations are not entitled to

deference under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467

U.S. 837 (1984), but has not articulated a viable reason as to why this should be so.

Congress unambiguously incorporated section 5330 into section 1960; section 5330

unambiguously incorporates section 5313.  Section 1960 acts in part as an enforcement

vehicle for section 5330.  See 31 C.F.R. § 103.41(e) (describing section 1960 as

establishing "a criminal penalty for failure to comply with the registration requirements of

31 U.S.C. 5330 or this section.").  The government recognized the relevance of the Bank

Secrecy Act statutes and regulations in the Superseding Indictment, which accused

Mazza of, among other things, "failing to comply with the money transmitting business

registration requirements under Section 5330 of Title 31, United States Code, and

regulations prescribed under such section  . . . ." (Superseding Indictment ¶ 5.)  The section

5313 regulations are not merely an interpretive tool for the Court, but a threshold

consideration for determining whether Turismo had an obligation to register with the

Treasury Department.[9]  Chevron deference is warranted for Treasury regulations passed

under the authority delegated to it by Congress.[10]

      I further note that the need to identify a federal registration obligation is

neither redundant nor in conflict with the requirement that a defendant be a "money

transmitting business" under 18 U.S.C. § 1960(a) & (b)(2).  In adopting section

1960(b)(1)(B), Congress incorporated the registration criteria of section 5330 (and as a

consequence, section 5313) into a substantive criminal law provision.  As currently

drafted, the definition of an unlicensed money-transmitting business contained in section

1960 acts as a threshold consideration before evaluating whether a defendant's activities

ran afoul of (1) state law, (2) section 5330's registration requirements, or (3) otherwise

implicated the transportation or transmission of funds known to support unlawful activity,

all of which are set forth at 18 U.S.C. § 1860(b)(1)(A-C).  By design, the terms of section

1960 contemplate that a defendant may satisfy the definition of an unlicensed money-

transmitting business at section 1960(a) and (b)(2), but not meet the criteria for any of the

three subsections to section 1960(b)(1).

---

[9] Because section 1960 acts as an enforcement tool for section 5330, the government's reliance on Crandon v. United States, 494 U.S. 152, 177 (1990) (Scalia, J., concurring), and Seneca-Cayuga Tribe of Oklahoma v. Nat'l Indian Gaming Comm'n, 327 F.3d 1019, 1031 (10th Cir. 2003), is misplaced.  The regulations at issue here do not provide interpretive guidance as to a criminal statute, but instead directly govern Turismo's registration obligation.

[10] I note than in United States v. Emilor, S.A., 2008 WL 2152279, at **8-10 (E.D. Tex. May 21, 2008), a United States Magistrate Judge recommended an approach to the relationship between section 1960 and the Treasury regulations similar to the government's arguments in this case, and recommended a holding that guilt under section 1960 could be determined based exclusively on section 1960's definition of what constitutes a "money transmitting business."  The Magistrate Judge also concluded that regulations promulgated under 31 U.S.C. §§ 5313 and 5330 were not entitled to Chevron deference, and had no bearing on a section 1960 prosecution. Id. at *9. However, in that case, the Magistrate Judge was considering a motion to dismiss an indictment, and concluded that an indictment setting forth section 1960 allegations need not incorporate terms of the Bank Secrecy Act registration requirements. Id. at *2.  In adopting the Report & Recommendation, the district judge emphasized that the Magistrate Judge's conclusions were limited to the face of the indictment.  2008 WL 2152279, at *2.  In this case, I upheld the validity of the indictment on a motion to dismiss by Mazza.  See United States v. Mazza-Alaluf, 2008 WL 318348 (S.D.N.Y. Feb. 5, 2008).

The government has provided the Court with little guidance for determining Turismo's reporting obligations, if any, pursuant to section 5313 and the regulations promulgated thereunder.  It asserts that to the extent the Court concludes that the substantive requirements and regulations under section 5313 are relevant, Turismo was required to register pursuant to 31 C.F.R. §103.22.  (Gov't Post-Trial Mem. at 30.)  31 C.F.R. §103.22(b)(1) states in relevant part:

> Each financial institution other than a casino shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution which involves a transaction in currency of more than $10,000, except as otherwise provided in this section.

The Treasury Department regulations set forth the following definition of a "financial institution":

> Each agent, agency, branch, or office <u>within the United States</u> of any person doing business, whether or not on a regular basis or as an organized business concern, in one or more of the capacities listed below:
>
> (3) A money services business as defined in paragraph (uu) of this section[.]

31 C.F.R. §103.11(n) (emphasis added).  Not only does the regulation require that the "financial institution" have an "agent, agency, branch, or office within the United States," but the identical requirement applies to a "money services business."  Under 31 C.F.R. § 103.11(uu), a "money services business" is defined as including "[e]ach agent, agency, branch, or office <u>within the United States</u> of any person doing business, whether or not on a regular basis or as an organized business concern, in one or more of the capacities listed in paragraphs (uu)(1) through (uu)(6) of this section."  (emphasis added).

Thus, both 31 CFR §103.11(n) and (uu) require that an institution be "within the United States" in order to be subject to the registration requirements of 31

C.F.R. § 103.22(b)(1), and thus qualify as both a "financial institution" and a "money transmitter." The phrase "within the United States" as used under the definitional regulations has been held not to apply to a financial institution physically located abroad. United States v. Riky, 669 F. Supp. 196, 199-200 (N.D. Ill. 1987) (construing phrase "within the United States" as used in the then-existing version of 31 C.F.R. § 103.11(e) as requiring a physical presence in the United States), disagreed with on other grounds in Tannenbaum, 934 F.2d at 12 (noting split with Seventh Circuit as to interpreting definitional scope of the word "person"). Section 103.11 contains no guidance for the meaning of the phrase "within the United States," insofar as it applies to "[e]ach agent, agency, branch, or office."[11]

The government asserts that under subparagraph (uu), a bank account qualifies as an "agent, agency, branch, or office within the United States." (Gov't Post-Trial Mem. at 31.) This position lacks support in the text of the regulations or the statutes. The Bank Secrecy Act and the regulations promulgated thereunder set forth detailed and specific provisions concerning banks and other regulated entities. The government has cited no provision that supports classifying a bank account as an "agent, agency, branch, or office." The government points to statutory language at 31 U.S.C. § 5312, which defines a "domestic financial institution" as applying to activities within the United States. However, the definitional sections at 31 CFR § 103.11(n) & (uu) explicitly delineate institutions within the United States. There is no textual support for classifying a bank account as an "agent, agency, branch, or office," and at trial, the government offered no

---

[11] "United States" is defined as "[t]he States of the United States, the District of Columbia, the Indian lands (as that term is defined in the Indian Gaming Regulatory Act), and the Territories and Insular Possessions of the United States." 31 C.F.R. § 103.11(nn).

evidence that supports categorizing Turismo's U.S. bank accounts as an "agent, agency, branch, or office" as a factual matter.[12]

As previously stated, defendant Mazza is guilty of the crime charged in count two by reason of Turismo's failure to obtain required licenses under the laws of Illinois, Michigan and New York.  I find that the government has not proved beyond a reasonable doubt that Mazza is guilty of count two by reason of Turismo's failure to register under federal law.


V.      Mazza Is Guilty of Conspiring to Conduct an Unlicensed Money-
        Transmitting Business Under 18 U.S.C. § 371.

Count One of the indictment charged Mazza with conspiring to conduct an unlicensed money-transmitting business.  Three elements are necessary to prove a conspiracy: (1) an agreement between two or more persons to commit a criminal act, (2) the defendant's knowing participation in the agreement, and (3) an overt act performed in furtherance of conspiracy performed in the Southern District of New York by the defendant or any other co-conspirator.  See generally United States v. Shellef, 507 F.3d 82, 104 (2d Cir. 2007) (setting forth elements of conspiracy); United States v. Monaco, 194 F.3d 381, 386 (2d Cir. 1999) (same).

'[A] conspiracy by its very nature is a secretive operation, and it is a rare case 'where all aspects of a conspiracy can be laid bare in court with the precision of a

---

[12] In addition to considering the regulation set forth at 31 C.F.R. § 103.22, I reviewed other potentially relevant regulations not cited by the parties.  Among them was 31 C.F.R. § 103.41(a)(1), which states in relevant part:  "Except as provided in paragraph (a)(2) of this section, relating to agents, each money services business (whether or not licensed as a money services business by any State) must register with the Department of the Treasury and, as part of that registration, maintain a list of its agents as required by 31 U.S.C. 5330 and this section. . . ."  Neither the government nor the defendant relied on section 103.41, a provision that, in any event, would appear return to the same inquiry as section 103.22: whether Turismo functions as a "money services business" under section 103.11(uu).

surgeon's scalpel." United States v. Pitre, 960 F.2d 1112, 1121 (2d Cir. 1992) (quoting

United States v. Porvenzano, 615 F.2d 37, 45 (2d Cir.), cert. denied, 446 U.S. 953

(1980)). "[A] defendant's knowing agreement to join a conspiracy must, more often than

not, be proven through circumstantial evidence." United States v. Lorenzo, 534 F.3d 153,

161 (2d Cir. 2008) (quoting United States v. Nusraty, 867 F.2d 759, 764 (2d Cir. 1989)).

Indeed, the existence of the conspiracy and a defendant's participation therein may be

proven based solely on circumstantial evidence.  United States v. Pitre, 960 F.2d at 1121.

Evidence of mere presence or mere association with conspirators is insufficient to support

a conviction for conspiracy.  Lorenzo, 534 F.3d at 159-60.

> To establish the first element, the government must prove beyond a
reasonable doubt that there was an agreement between Mazza and at least one other
person to knowingly manage an unlicensed money-transmitting business.  The evidence
proved beyond a reasonable doubt that Luis Mazza, the defendant's brother and partner in
Turismo, was instrumental in operating Turismo, including the opening of the Chase
account in Michigan and the Harris account in Chicago.   (Gov't Ex. 13, 36; Tr. at 251
(testimony from defendant Mazza that Luis Mazza helped arrange the opening of the
Chase account in Michigan).)  The evidence also established that Jose Miguel Mazza was
a signatory to Turismo's IDB accounts and Turismo's agency agreement with Beacon Hill,
(Gov't Ex. 23, 25, 31) and that various other individuals, including Mauricio Mazza, Jose
Miguel Mazza, Daniel Mazza, Alan Mazza, Mauricio Majenas and Juan Lama
transported bulk currency into the United States.  (Tr. at 145 (unrefuted testimony of
Cezary K. Tchorznicki identifying the above-named individuals and stating that they
transported cash from "late August 2002 until March of 2007" using LAX as their point of

entry).)  This evidence was sufficient to prove that an agreement existed between two or more persons to operate an unlicensed money-transmitting business.

As to the second element, the government established beyond a reasonable doubt that Mazza was an active and knowing participant in Turismo's actions as unlicensed money-transmitting business.  As detailed above, he was closely involved with many facets of Turismo's operation as an unlicensed money-transmitting business, including acting as a courier in its process of physically transporting money into the United States, the opening and use of its United States bank accounts, and its overall business operations affecting commerce in the United States.

Third, I find that there were several overt acts in furtherance of the conspiracy that were performed in the Southern District of New York.  The government proved that a check in the amount of $36,512 was drawn on Turismo's account at IDB under account number 08-2801-9, signed by the defendant and Manuel Palacios, and endorsed by Phillips Medical Systems, Netherland B.V.  (Gov't Ex. 24-EE, Bates Stamp No. 6889.)  The check cleared through IDB in Manhattan. (Gov't Ex. 24-EE, Bates Stamp No. 6888.)  Beyond reasonable doubt, this check was part of Turismo's money-transmitting business.  In addition, Mazza and other Turismo officials employed the services of Manhattan-based Beacon Hill (Gov't Ex. 32, 32-T) and directed numerous wire transfers made to and using New York banks.  (Gov't Ex. 8, 8-T.)

I find beyond a reasonable doubt that Mazza conspired under 18 U.S.C.§

371 to own, manage, supervise and conduct an unlicensed money-transmitting business.

Conclusion

I find Mazza guilty of count one of conspiring to own, manage, supervise and conduct an unlicensed money-transmitting business.  18 U.S.C. § 371.

I find Mazza guilty of count two of owning, managing, supervising and conducting an unlicensed money-transmitting business without complying with the relevant licensing requirements set forth under the laws of the states of Illinois, Michigan and New York.  18 U.S.C. § 1960(b)(1)(A).

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       January 29, 2009